UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Alan R. Vaughn,

Plaintiff,

v.

MEMORANDUM OPINION AND ORDER
Civil No. 00-2370 (MJD/JGL)

City of North Branch,
Thomas Miller et al.,

Defendants.

---

Plaintiff is pro se.

Richard J. Thomas and Bryon G. Ascheman, Burke & Thomas, for and on behalf of Defendant Thomas Miller.

---

Plaintiff Alan Vaughn brought this action against the City of North Branch, and various officials of the City, claiming that the defendants violated his constitutional rights to due process, equal protection, and his equal privileges and immunities under the laws when they denied him approval of a plat development plan for a proposed planned unit development. Amended Complaint ¶¶ 3-5.

Factual Background

In May 1997, Plaintiff submitted a concept plan of a proposed planned unit development called "Peltier Place" to the City Planning Commission. Ex. 37[1]. The original plan submitted included a development on 80 acres, with 32 lots and a planned golf course. Plaintiff alleges that he always planned on seeking

[1] Plaintiff has submitted two sets of exhibits. For purposes of this motion, the exhibits referred to herein are those included in Docket No. 5, unless otherwise noted.



OCT 3 0 2001
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

approval for an additional 32 lots. These allegations are born out by some of the documents Plaintiff submitted to the Court. In a memorandum to the Planning Commission, the City Planner, Patrick Trudgeon, described the proposed development as including 64 lots. Id. The plan submitted to the Planning Commission for review, however, included only 32 lots. Ex. 38. In the report prepared by the Planning Commission staff, it was noted:

> The layout of the development as well as the density of the development meets the guidelines of a cluster development as identified in the North Branch Comprehensive Plan. (32 units on 80 acres). This development is currently being considered a Planned Unit Development (PUD) for the time being since the applicant is considering placing an additional 32 units in the western part of the parcel. Designating the parcel as a PUD will require a rezoning change. If the applicant decides to not seek approval for the PUD for the additional units, the development would meet North Branch's guidelines for cluster development.

Ex. 38.[2] The Notice further identified access issues: that two roads that could provide access to the development were not hard surfaced. Id. At the June 16, 1997 meeting, the Planning Commission voted to recommend approval of the proposed development to the City Council, subject to certain conditions. Ex. 39.

The City did not adopt the recommendation of the Planning Commission however. Rather the Council tabled its decision as to Plaintiff's proposed development in order to resolve certain issues. Ex. 5. One of the issues raised concerned road access to the proposed development. Id. The proposed development plan was again discussed by the City Council on July 14, 1997, and again on July 28, 1997, but still no decision was rendered. Instead, the Council

[2] This exhibit is found in the packet designated as Docket 3, Ex. 38, p. 5.

determined to seek legal advice from the City Attorney, Defendant Thomas Miller ("Miller") with respect to a number of unresolved issues. Id.

Miller is a private attorney who serves as the City Attorney for the City of North Branch. Miller did provide a memorandum to the City Planner, Pat Trudgeon, addressing a number of legal issues concerning the proposed development. One issue addressed was whether the City could charge the developer for the Evergreen Avenue Road Improvement. His legal opinion was that generally, developers could not be assessed such costs, but that other jurisdictions have allowed such a requirement. Ex. 46. He recommended that the City negotiate with Plaintiff regarding some or all of the costs, and if such negotiations fail, to seek another method of payment. Id. Miller also addressed the issue of whether the City could assess the improvements against Peltier Place property. He stated that property could be assessed if the property benefited from the improvement, but recommended that the City hire an appraiser to determine the benefit/market value analysis on Peltier Place property, and on two adjoining properties. Id. Finally, Miller addressed whether the City could require Plaintiff to dedicate 66' at the eastern edge of the property for a road. He opined that such a requirement could be imposed, but cautioned the City to first determine the best access to Peltier Place. Id.

On August 11, 1997, the City Council approved Plaintiff's proposed development plan, which provided for 32 lots, subject to certain conditions; one being that 66' be dedicated for Eaglewood Avenue on the final plat, and that no development could occur until Eaglewood Avenue was improved to City

standards. Ex. 40. Plaintiff alleges that this requirement was unnecessary because Eaglewood Avenue was not necessary for access. Ex. 5. He further alleges that this condition would have required him to pay the costs to improve the street that would benefit adjoining property owners, some of which were council members. Id. Plaintiff alleges that he attempted to resolve these issues over the next six months. Id. He ultimately concluded that if he needed to redesign the plat, he would also seek to obtain approval for the additional 32 lots, for a total of 64 lots. Id.

City staff prepared a preliminary plat report for the City regarding Plaintiff's amended development plan, which included 64 lots. Ex. 45. The report noted that although the City Ordinances did not address cluster developments, the City's Comprehensive Plan limited the density to 16 units per 40 acres. See, City of North Branch Comprehensive Plan, Ex. 45, p. 17. As Peltier Park was proposed on approximately 81 acres, the parcel could not have more than 32 dwelling units, in order to be consistent with the Comprehensive Plan. Id. The staff further noted that even if it considered the proposed development a PUD, rather than a cluster development, the PUD ordinances did not support the proposed development.

> In reviewing the current Planned Unit Development ordinance, increasing the total number of allowable lots is not a proper use of a P.U.D. P.U.Ds are often used to increase the density of housing units on individual lots, but not to increase the overall density of housing units. As an example, a proposal showing 28 lots on this land, with 24 lots being single family residences and four of the lots proposed to be two-unit townhomes would qualify for consideration as a P.U.D. use since the total number of residential units would be 32. Planned Unit Developments allow for

> different uses on the land than what it is zoned for, not for a greater number of overall residential units.

Id. The staff then recommended that the preliminary plat for Peltier Park be denied. Id.

On April 13, 1998, the City Council denied approval of the preliminary plat on four bases: 1) the number of lots, 64, is greater than recommended by the City's Comprehensive Plan; 2) the proposal does not qualify as a Planned Unit Development, because it proposes an increase in the number of residential units; 3) the proposed access from existing public roads was inadequate; and 4) based on the above, the proposal is inconsistent with the design standards, growth management system and zoning ordinances of the City. Ex. 41.

At about this time, a separate issue arose concerning an adjoining landowner that had sought a building permit from the City to build a home that would block future extension of Eleanor Avenue, another proposed access to Peltier Park. Plaintiff objected to the issuance of such a permit, and Defendant Miller was again asked to provide his legal opinion. Miller addressed this issue in a memorandum to the City Administrator, John Moosey, dated April 21, 1998. Ex. 33. Miller opined that as Plaintiff had not yet received approval for his proposed development, the City could not withhold the issuance of a building permit to the landowner. Id. He further noted that although Plaintiff had proposed the use of Eleanor Avenue to access the development, the City had not yet taken any action to propose such a right-of-way. Miller noted that if the City did not issue the permit, the applicant may claim a regulatory taking – that his

private property has been taken without justification. Id. Miller thus advised the City Administrator that the permits should issue. Id.

Defendant Miller also provided a legal opinion to the Planning Commission regarding the City's definition of a "Planned Unit Development". Ex. 48. Based on his review of the relevant ordinances, the City's Comprehensive Plan and relevant law, Miller opined that the Planning Commission has the authority to deny the preliminary plat for Peltier Park because the proposed plat of 64 lots is in clear conflict with the density limitations contained in the Comprehensive Plan. Id. p. 2.

Plaintiff alleges that in September 1998, he went into a deep depression, and was forced to sell the property at a tremendous financial loss. Ex. 5.

Plaintiff thereafter brought this action, alleging that the defendants collectively deprived him of the right to develop his property, by denying him the requisite approval for such development, in violation of his civil rights and his rights to equal protection and due process. Plaintiff asserts causes of action against the defendants pursuant to 42 U.S.C. §§ 1981, 1983, 1985(3), 1986 and 1988, an 18 U.S.C § 241, 242 and 1957. Amended Complaint ¶ 3. Before the Court is Defendant Miller's motion to dismiss, or in the alternative, for summary judgment. Because the Court has referred to documents outside of the Complaint, the Court will treat this motion as one for summary judgment.

Standard for Summary Judgment

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ.

P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Unigroup, Inc. v. O'Rourke Storage & Transfer Co., 980 F.2d 1217, 1219-20 (8th Cir. 1992). To determine whether genuine issues of material fact exist, the court determines materiality from the substantive law governing the claim. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Disputes over facts that might affect the outcome of the lawsuit according to applicable substantive law are material. Id. A material fact dispute is "genuine" if the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party. Id. at 248-49.

Analysis

With regard to Plaintiff's proposed development plan, Miller provided the City legal advice on three occasions regarding the following: whether the City could charge a developer for certain road upgrades; whether the City could deny a property owner a building permit on the basis that such building may impede a potential right of way; and whether the density limitations set forth in the City's Comprehensive Plan applied to planned unit developments. Plaintiff alleges that Miller's legal opinions were inconsistent with "most, if not all 'clearly established' law to the contrary." Plaintiff's Statement of Facts, p. 10.

Section 1981 Claim

Plaintiff alleges that defendants engaged in invidious discrimination, and thus violated Section 1981 by imposing conditions to obtain approval for the preliminary plat for Peltier Place.

Title 42 U.S.C. § 1981 provides that:

> [a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

In order to prevail on this claim, Plaintiff must show that he is a member of a protected class. Barge v. Anheuser-Busch, Inc., 87 F.3d 256, 258 (8th Cir. 1996). Plaintiff, who is white, has not pleaded any facts establishing that he is a member of a protected class. In addition, as against Defendant Miller, Plaintiff has failed to allege facts that would show Miller treated similarly situated persons, outside his alleged protected class, differently than Plaintiff. The only factual allegations asserted against Miller involve the legal opinions that he provided to the City.

Because Plaintiff has failed put forth sufficient evidence to establish a prima facie case with respect to his § 1981 claim, Miller is entitled to summary judgment as to this claim.

Section 1983 Claim

Plaintiff also alleges that defendants deprived him of his rights to due process, equal protection and equal privileges and immunities under the law. Plaintiff alleges that Miller contributed to the conspiracy to deprive him of his constitutional rights by providing erroneous legal opinions to the City Administrator, the City Planner and Planning Commission.

There are two essential elements to a Section 1983 claim: 1) the conduct complained of must be committed by someone acting under the color of state

law; and 2) such conduct deprived the Plaintiff of his rights, privileges or immunities secured by the Constitution or laws of the United States. DuBose v. Kelly, 187 F.3d 999, 1002 (8th Cir. 1999). The first element is not at issue. Miller does argue, however, that this claim should be dismissed as Plaintiff cannot show that Miller deprived him of a right guaranteed by the Constitution or by law.

A. Substantive Due Process

To prevail on the claim that he was deprived of substantive due process, Plaintiff must first show a "protected property interest to which the Fourteenth Amendment's due process protection applies." Bituminous Materials, Inc. v. Rice County, Minnesota, 126 F.3d 1068, 1070 (8th Cir. 1997)(citation omitted). To determine whether Plaintiff has a protected property interest, the Court must refer to state law. Id. Further, such interest must be "a legitimate claim to entitlement . . . as opposed to a mere subjective expectancy." Id. Thus, Plaintiff must show that by state statute or regulation, the City was substantially limited with respect to its ability to approve development plans. Id. In other words, did the applicable ordinances require the City to approve the development plan, upon Plaintiff's compliance with the terms and conditions prescribed by such ordinance. Id.

In addition, the Eighth Circuit has determined that with regard to zoning and land-use disputes, "the plaintiff must show more than that the government decision was arbitrary, capricious, or in violation of state law." Chesterfield Development Corporation v. City of Chesterfield, 963 F.2d 1102, 1104 (8th Cir. 1992)(citing Lemke v. Cass County, Nebraska, 846 F.2d 469, 470-471 (8th Cir.

1987)(en banc)). Rather, such claims should be limited to "truly irrational" governmental actions. Id.

Plaintiff argues that as he received preliminary approval for his proposed development from the City Council in April 1997, a protected property interest in his proposed development was established. It is also Plaintiff's position that Miller provided legal opinions adverse to that interest. The August 1997 memo addressed a number of issues concerning roads through the proposed development; such as the required width of roads, whether the City could assess the developer for improvements to roads; whether the City could require the developer to dedicate a road in the development. See Ex. 46. However, this memo was prepared three days prior to Plaintiff obtaining preliminary approval for his development, therefore the August 1997 memo cannot form the basis of a § 1983 claim.

Even if he could show that he had a protected property interest at the time the August 1997 memo was submitted, Plaintiff cannot show that the legal opinions contained therein are adverse to his interests, or were truly irrational. In fact, in certain respects, the memo is favorable to Plaintiff. For example, Miller opined that as a general rule, a developer should not be assessed, as a condition for approval, the costs of improvement to roads, and he did not recommend that the City assess Plaintiff. Id., p. 1.

The April 1998 memorandum addressed the issue of whether "the City has the right to issue a building permit for construction of a house on real property if a developer has threatened litigation regarding access to the development that

includes said real property." Ex. 33, p. 5. It was apparently Plaintiff's wish to have Eleanor Avenue extended through an adjacent property to provide access to his development. The owner of the adjacent property, however, sought a building permit to build on the area through which Eleanor Avenue would be extended. Miller advised the City that it could issue the building permit, as Plaintiff did not have a present right to a future roadway, and because the landowner could bring a takings action against the City if the permit was denied. It is Plaintiff's position that as the Eleanor Avenue access was a condition for approval for an adjacent development, that he too should have access to Eleanor Avenue.

To prevail on the claim that this memo forms the basis of a substantive due process claim, Plaintiff must show that he had a right to the extension of such road. Plaintiff argues that City Code, ch. 16.20.010 required that Eleanor Avenue be extended. The Court disagrees. Chapter 16.20.010 provides:

> The arrangements of streets in a subdivision shall either provide for the continuation of existing streets in surrounding areas or conform to a plan for the neighborhood approved or adopted by the council to meet a particular situation where topographical or other conditions make continuance of existing streets impractical.

Although the cited ordinance does provide for design standards for the arrangement of streets in subdivisions, the ordinance contains no language that can be interpreted as requiring the City in this case to protect the extension of Eleanor Avenue over the right of the landowner to use his/her property as he/she sees fit that is otherwise consistent with zoning ordinances, as there were alternative roads to provide access to the proposed development.

Plaintiff further argues that City Code, Ch. 17.52.030(B) supports his position. This ordinance provides: "All buildings shall be so placed so that they will not obstruct future streets which may be constructed by the city in conformity with existing streets and according to the system and standards employed by the city." At the time this opinion was rendered, Plaintiff had only received preliminary approval for his proposed development plan, and that such approval was not conditioned on the extension of Eleanor Avenue as access to the development. Plaintiff has not alleged, or put forth any evidence that at the time the building permit was requested, the City had sought or obtained a right-of-way to extend Eleanor Avenue over private property. Absent such evidence, Plaintiff cannot show that the proposed extension to Eleanor Avenue was a "future street." Accordingly, ch. 17.52.030 did not create a protectible property interest in the proposed extension to Eleanor Avenue.

Even if Plaintiff could prove that he had a right to such an extension, he must also show that the opinion was "truly irrational." Chesterfield, at 1104 (truly irrational conduct would be a zoning ordinance that applies only to persons whose names begin with a letter in the first half of the alphabet). Based on the facts of this case, and the relevant law, no reasonable fact finder could conclude that the legal opinion rendered by Miller regarding this issue was truly irrational.

Finally, the September 1998 memo addressed the issue of the definition of the City's "Planned Unit Development" and the City's discretion in granting or denying approval for a PUD. Plaintiff argues that Miller's opinion that the City had the discretion to deny approval for his proposed development plan is not

supported by the relevant ordinances. Plaintiff points out that the PUD Planned Unit Development District ordinances provide that "[t]he purpose of the PUD planned unit development is to permit great flexibility in the use and design of structures and land" when modifications will not otherwise be inconsistent with PUD ordinances, or "will not harm the neighborhood in which the districts occur." City Code, Ch. 17.36.010. The ordinances further provide they are applicable "to any lot exceeding two acres in size." Ch. 17.36.030. He further argues that there is no language in the PUD ordinance, including the definition of "Planned unit development" provided therein, that imposes density limits. Plaintiff thus appears to argue that as the PUD ordinances do not contain density limits, and he otherwise complied with the relevant laws and regulations, he had a right to obtain the City's approval for his second proposed development that included 64 lots.

However, as Miller pointed out in his legal opinion to the City, the PUD ordinances also provided that PUD's "must be consistent with the goals, policies, and objectives of the City's Comprehensive Land Use Plan . . ." Ex. 42, City Codes Ch. 17.40.050 (B). In BBY Investors v. City of Maplewood, 467 N.W.2d 631, 634 (Minn. Ct. App. 1991), the court held that Minnesota law prohibits a local government from adopting "any official control * * * which is in conflict with its comprehensive plan." (citing Minn. Stat. § 473.865, subd. 2 (1988)). The court further held that a zoning ordinance supersedes a comprehensive plan only when the two conflict. Id. Where there is no conflict, a city council may deny a permit where the requested use would not conform to the comprehensive plan. Id.

In this case, as pointed out by Plaintiff, the PUD ordinance does not contain a specific density limitation. The Comprehensive Plan, however, does provide a density limit of 16 dwelling units per 40 acres. As the PUD ordinance directed the City to ensure that land use districts comply with the goals, policies and objectives of the Comprehensive Plan, Plaintiff cannot show that he was entitled to approval of his PUD, which included 64 lots, pursuant to the relevant laws. It is irrelevant that the City provided preliminary approval for the initial proposed development, as that development plan only contained 32 lots. As pointed out by the Planning Commission staff in its report for the initial development, Plaintiff's original development plan was consistent with the Comprehensive Plan as it included only 32 on the 80 acres. Ex. 38.[3] The Court finds that Plaintiff has failed to submit sufficient evidence to show that he had a protectible property interest in obtaining approval for the 64 lot development plan.

Even if Plaintiff could show that his proposed development for 64 lots complied with the relevant ordinances and the City's Comprehensive Plan, Plaintiff's claim that the September 1998 legal opinion violated his substantive due process rights fails for the additional reason that no reasonable factfinder would find Miller's legal opinion was "truly irrational".

B. Procedural Due Process

"In the zoning context, assuming a landowner has a protectible property interest, procedural due process is afforded when the landowner has notice of the

[3] Docket 3, Ex. 38, p. 5.

proposed government action and an opportunity to be heard." Anderson v. Douglas County, 4 F.3d 574, 578 (8th Cir. 1993). In his Amended Complaint, the Plaintiff does not allege a procedural due process claim. In any event, the documents submitted to the Court by Plaintiff establish that he was given notice of the decisions made by defendants with regard to the requested building permit that would interfere with the proposed extension of Eleanor Avenue, and with regard to the denial of his preliminary plat that included 64 lots, and that he was given the opportunity to respond to such decisions.

C. Equal Protection

"A party claiming a violation of equal protection must establish that he or she is 'similarly situated' to other applicants for the license, permit, or other benefit being sought, particularly with respect to the same time period." Anderson, 4 F.3d at 577. It is Plaintiff's contention that he was treated differently than other developers. He appears to argue that the developers of the Viking Park 4th Addition, which is adjacent to his proposed development, were able to extend Eleanor Avenue as part of that development. Plaintiff has not sufficiently established that these developers were similarly situated to Plaintiff. For example, there is no evidence before the Court that the developers of the Viking Park 4th Addition were granted the extension of Eleanor Avenue over the objections of the property owner over which the road was extended.

Plaintiff further alleges that defendant Steven Vanden Heuvel, who is a City Council member and developer, received approval for an increase in density with regard to the Nelson Meadow/Mystic Woodlands development. Plaintiff further

alleges that Miller somehow played a role in defendant Heuvel receiving this preferential treatment.

Plaintiff has not, however, submitted any evidence that Vanden Heuvel was similarly situated to Plaintiff. Plaintiff's Exhibit 52 is a portion of the Planning Commission's report regarding the Mystic Woodland/Nelson Meadows PUD. The report notes that the developer seeks to place five twinhomes within two separate subdivisions. To establish an equal protection claim in this case, however, Plaintiff must show that these developers were allowed to develop properties contrary to the density limits set forth in the City's Comprehensive Plan. Because the Mystic Woodland/Nelson Meadows PUD involved only ten units, the density limits of the Comprehensive Plan were not implicated.

Even if Plaintiff could show that other developers were allowed to develop land contrary to the density limits set forth in the Comprehensive Plan, Plaintiff has not presented the Court any evidence to show that Miller assisted or contributed in the provision of preferential treatment to such other developers.

D. Privileges and Immunities

In his Amended Complaint, Plaintiff alleges that defendants deprived him of his equal privileges and immunities under the laws. A claim under the Fourteenth Amendment's privileges and immunities clause is to be narrowly construed. Deubert v. Gulf Federal Savings Bank, 820 F.2d 754, 760 (5th Cir. 1987). "The clause protects only uniquely federal rights such as the right to petition Congress, the right to vote in federal election, the right to interstate travel, the right to enter federal lands, or the rights of a citizen in federal custody."

Id. Because the facts of this case do not implicate any of these rights, the Court finds that Plaintiff has failed to state a claim under the privileges and immunities clause.

Section 1985(3) Claim

Section 1985(3) provides:

> If two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws or of the equal privileges and immunities under the law . . . the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

The Supreme Court has held that a private conspiracy is covered by § 1985(3). Griffin v. Breckenridge, 403 U.S. 88, 101 (1971). "That the statute was meant to reach private action does not, however, mean that it was intended to apply to all tortious, conspiratorial interferences with the rights of others." Id. In order to give full effect to the congressional purpose, the Court stressed that as a required element of a cause of action under § 1985(3), a plaintiff must allege "some racial, or otherwise class-based, invidiously discriminatory animus behind the conspirators' actions." Id. at 102.

Plaintiff has not alleged that the alleged conspirators have acted based upon a racial, or otherwise class-based, invidiously discriminatory animus, or that he is a member of such a class. Accordingly, Plaintiff has failed to state a cause of action under § 1985(3).

Section 1986 Claim

Section 1986 imposes liability upon one who knows of a conspiracy prohibited by § 1985, and who has the power to prevent the same, but neglects or refuses to do so. Because Plaintiff has not plead sufficient facts to support his § 1985 claim, this claim fails as well. Kaylor v. Fields, 661 F.2d 1177, 1184 (1981).

Remaining Claims

The remaining claims asserted against defendants are criminal statutes that do not provide for a private cause of action. See, United States v. Wadena, 152 F.3d 831, 845 (8th Cir. 1998)(noting that 18 U.S.C. §§ 241 and 242 do not provide for a private cause of action); 18 U.S.C. § 1957.

IT IS HEREBY ORDERED THAT Defendant Thomas Miller's Motion for Dismissal and for Summary Judgment is GRANTED. Plaintiff's claims asserted under 42 U.S.C. §§ 1981, 1985(3) and 1986, and 18 U.S.C. §§ 241, 242 and 1957 are dismissed as against all defendants. Plaintiff's claims under 42 U.S.C. § 1983 as asserted against Defendant Thomas Miller are dismissed.

Date: Oct. 30, 2001

Michael J. Davis
Michael J. Davis
United States District Court